**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ROBERT YBARRA, JR.,
   *Petitioner-Appellant*,

    v.

TIMOTHY FILSON, Warden,
   *Respondent-Appellee.*

No. 13-17326

D.C. No.
3:00-cv-00233-
GMN-VPC

ROBERT YBARRA, JR.,
   *Petitioner-Appellant*,

    v.

TIMOTHY FILSON, Warden; ADAM
PAUL LAXALT, Nevada Attorney
General,
   *Respondents-Appellees.*

No. 17-15793

D.C. No.
3:00-cv-00233-
GMN-VPC

Appeal from the United States District Court
for the District of Nevada
Gloria M. Navarro, Chief Judge, Presiding

ROBERT YBARRA, JR.,
                         *Petitioner*,

                    v.

TIMOTHY FILSON, Warden; ADAM
PAUL LAXALT, Nevada Attorney
General,
                         *Respondents*.

No. 17-71465

OPINION

Application to File Second or Successive Petition
under 28 U.S.C. § 2254

Argued and Submitted July 21, 2017
San Francisco, California

Filed September 1, 2017

Before:  Barry G. Silverman, Richard C. Tallman,
and Richard R. Clifton, Circuit Judges.

Opinion by Judge Tallman

# SUMMARY[*]

## Habeas Corpus / Death Penalty

The panel (1) vacated the district court's order denying Nevada state prisoner Robert Ybarra's motion under Fed. R. Civ. P. 60(b) to reopen his habeas corpus proceedings challenging his death sentence based on *Atkins v. Virginia*, 536 U.S. 304 (2002), and remanded for reconsideration; (2) affirmed the district court's order denying Ybarra's Rule 60(b) motion raising a claim based on *Hurst v. Florida*, 136 S. Ct. 616 (2016), which invalidated Florida's capital sentencing scheme; and (3) denied Ybarra's application for leave to file a second or successive habeas petition raising a claim based on *Hurst*.

Ybarra claims that he is categorically exempt from the death penalty because he is intellectually disabled. The panel held that Ybarra's *Atkins*-based Rule 60(b) motion was not a disguised second or successive habeas petition, and that the district court therefore did not err in concluding that it had jurisdiction to consider it. Reviewing de novo, the panel held that the district court erred in its AEDPA analysis of the *Atkins*-based motion by overlooking a number of instances where the Nevada Supreme Court contradicted the very clinical guidelines that it purported to apply, which is especially problematic in light of the decision in *Bromfield v. Cain*, 135 S. Ct. 2269 (2015), and by refusing to consider a doctor's report concluding that Ybarra was intellectually

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

disabled, which was part of the record under *Cullen v. Pinholster*, 563 U.S. 170 (2011).

The panel held that the Ybarra's *Hurst*-based Rule 60(b) motion was a disguised and unauthorized second or successive habeas petition, and therefore affirmed the district court's order denying the motion.

The panel held that *Hurst* does not apply retroactively, and therefore denied Ybarra's properly-filed application for leave to file a second or successive habeas petition in which he argues, based on *Hurst*, that Nevada's capital sentencing scheme is unconstitutional.

**COUNSEL**

Randolph M. Fiedler (argued) and Michael Pescetta, Assistant Federal Public Defenders; Rene L. Valladares, Federal Public Defender; Office of the Federal Public Defender, Las Vegas, Nevada; for Petitioner-Appellant.

Jeffrey M. Conner (argued), Assistant Solicitor General; Adam Paul Laxalt, Attorney General; Office of the Attorney General, Carson City, Nevada; for Respondents-Appellees.

**OPINION**

TALLMAN, Circuit Judge:

On September 28, 1979, Robert Ybarra kidnapped, beat, and sexually assaulted sixteen-year-old Nancy Griffith in rural White Pine County, Nevada. He then doused her in gasoline, set her on fire, and left her to die a slow and

agonizing death. At trial, he pled not guilty by reason of insanity. But the jury rejected his defense, found him guilty, and determined that his crime was sufficiently aggravated to warrant the death penalty.

There is no question that Ybarra's crime falls within the "narrow category of the most serious crimes" that would ordinarily render him eligible for the death penalty. *Atkins v. Virginia*, 536 U.S. 304, 319 (2002). But Ybarra now claims he is categorically exempt from the death penalty because he is intellectually disabled. *See Moore v. Texas*, 137 S. Ct. 1039, 1051 (2017) ("States may not execute anyone in 'the *entire category* of [intellectually disabled] offenders.'" (alteration in original) (quoting *Roper v. Simmons*, 543 U.S. 551, 563 (2005)).

The Nevada Supreme Court rejected Ybarra's claim of intellectual disability on the merits. *See Ybarra v. State*, 247 P.3d 269 (Nev. 2011). The district court then deferred to its determination under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). For reasons explained below, we vacate its order in Case No. 13-17326, and remand for reconsideration.

To be clear, we express no view as to whether the Nevada Supreme Court's intellectual disability determination was reasonable, in which case the district court should again defer to it; or unreasonable, in which case the district court should "proceed to consider" Ybarra's *Atkins* claim de novo. *See Maxwell v. Roe*, 628 F.3d 486, 494–95 (9th Cir. 2010). Instead, we give the district court an opportunity to consider a number of issues in the first instance. *See Badea v. Cox*, 931 F.2d 573, 575 n.2 (9th Cir. 1991) ("[W]e see no reason to decide *ab initio* issues that the district court has not had an opportunity to consider . . . .").

On the other hand, we conclude that the arguments raised in the consolidated matters, which rely on *Hurst v. Florida*, 136 S. Ct. 616 (2016), are without merit. We therefore affirm the district court's order dismissing that claim in Case No. 17-15793, and we deny Ybarra's application for leave to file a second or successive habeas petition in Case No. 17-71465.

## Background

This case has a complex and protracted history spanning nearly thirty-eight years. It involves several rounds of habeas review, a variety of motions, and a number of obscure procedural issues. Although we have tried to limit our discussion to the procedural matters immediately relevant on appeal, even our summary is lengthy.

Ybarra was convicted and sentenced to death in 1981. After his conviction and sentence were affirmed on direct appeal, *see Ybarra v. State*, 679 P.2d 797 (Nev. 1984), he sought relief on collateral review. In total, he filed five state and three federal habeas corpus petitions. *See Ybarra v. McDaniel*, 656 F.3d 984, 988–90 (9th Cir. 2011) (describing the first four state and all three federal petitions).[1]

All three federal petitions were defective due to failure to exhaust. The first was filed in 1987 and dismissed without prejudice in 1988; and the second was filed in 1989 and dismissed without prejudice in 1993. *Id.* At this time, the federal district court warned Ybarra that it would not tolerate another defective petition, and that this would be his "last

---

[1] Ybarra filed his fifth state petition earlier this year. *See infra* note 14.

opportunity to return to state court to exhaust all grounds for relief." *Id.* at 997. Nevertheless, when Ybarra filed his third federal petition in 2002,**[2]** he again brought several unexhausted claims—including a claim of intellectual disability under *Atkins*.

The district court cited its prior admonition, ordered Ybarra to abandon his unexhausted claims, and considered the remaining claims on the merits. It then denied habeas relief in 2006, and we affirmed in 2011. Notably, we denied a certificate of appealability (COA) as to whether the district court abused its discretion by ordering Ybarra to abandon his unexhausted claims. We concluded that the issue was not reasonably debatable in light of the prior warning in 1993. *Id*. (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Ybarra also pursued his *Atkins* claim by filing his fourth state habeas petition. This petition was originally dismissed on procedural grounds, but the Nevada Supreme Court reversed and remanded with instructions to proceed in accordance with Nevada Revised Statutes § 175.554(5) (2015).**[3]** The Nevada state district court then conducted a

---

**[2]** Ybarra actually filed his third federal petition in 2000, but this petition was amended in 2002 after he received assistance from the public defender.

**[3]** Section 175.554(5), enacted in 2015 in response to *Atkins*, provides that:

> If a sentence of death is imposed and a prior determination regarding intellectual disability has not been made pursuant to NRS [§] 174.098, the defendant may file a motion to set aside the penalty on the grounds that the defendant is intellectually disabled. If such a motion is filed, the court shall conduct a hearing

two-day evidentiary hearing, concluded that Ybarra failed to prove intellectual disability, and denied his motion to strike the death penalty in 2008.  The Nevada Supreme Court affirmed in a reasoned opinion in 2011.  *See Ybarra*, 247 P.3d 269.

But Ybarra filed a petition for rehearing.  In support, he attached a supplemental report by Dr. Erin Warnick, who evaluated Ybarra in 2001.  That report, dated April 11, 2011, also summarized a report by Dr. Jonathan Mack, who evaluated Ybarra in 2010.  Both doctors opined that Ybarra was intellectually disabled, but neither report was ever presented at the trial court's evidentiary hearing.

The Nevada Supreme Court denied the petition on June 29, 2011.  Its order read, in its entirety, "Rehearing denied.  NRAP 40(c).  It is so ORDERED."[4]  It also contained a footnote, which specified that:

> In resolving this petition for rehearing, we have not considered any evidence that was not presented to the district court in the first

_____

> on that issue in the manner set forth in NRS [§] 174.098.

[4] Rule 40(c) of the Nevada Rules of Appellate Procedure provides that "no point may be raised for the first time on rehearing," and specifies that rehearing is proper:

> When the court has overlooked or misapprehended a material fact in the record or a material question of law in the case, or . . . [w]hen the court has overlooked, misapplied or failed to consider a statute, procedural rule, regulation or decision directly controlling a dispositive issue in the case.

instance. We strike the document attached to the petition for rehearing authored by Dr. Erin Warnick.

Only six of the seven justices joined this order in full. Justice Cherry wrote separately to "concur in the result only."

Ybarra then filed a motion for reconsideration before the state supreme court, and again attached a report that was never presented to the state district court. This report was authored by Dr. Stephen Greenspan, the most-cited authority in the 2002 and 2010 diagnostic manuals of the American Association on Intellectual Disabilities (AAID),[5] who criticized the state courts' analyses and argued that their opinions incorporated "questionable lay stereotypes." Dr. Greenspan also concluded that Ybarra was intellectually disabled after examining him, interviewing several of his family members, and reviewing his academic and medical history.

The Nevada Supreme Court "considered" but denied the motion. Significantly, it did not strike the Greenspan report as it had done with the Warnick report; and all seven justices, including Justice Cherry, joined this order in full.

Having fully exhausted his state court remedies, Ybarra once again returned to federal court. He filed a motion asking the district court to set aside its prior judgment in accordance with Federal Rule of Civil Procedure 60(b), reopen habeas proceedings, and allow him to re-allege his

---

[5] The AAID was previously known as the American Association on Mental Retardation (AAMR).

previously-abandoned *Atkins* claim.   Both the Greenspan report and the Mack report were attached to this motion.

The district court denied the motion on the merits.  It acknowledged that Ybarra's "circumstances [were] unique and therefore weigh[ed] in favor of Rule 60(b) relief," but concluded that additional habeas proceedings "would be futile" because the state court's intellectual disability determination is entitled to deference under AEDPA.  The district court did not consider either the Mack report or the Greenspan report when it made this determination.  It noted that these reports were not part of the record in 2011, when the Nevada Supreme Court issued its reasoned opinion, and concluded that it was therefore barred from considering them under *Cullen v. Pinholster*, 563 U.S. 170 (2011).

Ybarra then filed a motion to alter or amend the order denying his *Atkins*-based Rule 60(b) motion.  He argued that the district court committed clear error and made a futility determination that was manifestly unjust when it refused to consider the attached reports. *See Dixon v. Wallowa County*, 336 F.3d 1013, 1022 (9th Cir. 2003) (describing the circumstances warranting relief under Federal Rule of Civil Procedure 59(e)).   The district court rejected Ybarra's arguments related to the excluded reports, but it granted a COA as to:

> Whether [it] erred in deferring, under 28 U.S.C. § 2254(d), to the state court's finding that [Ybarra] is not intellectually disabled as contemplated by *Atkins*.

We first heard argument on this question in June 2016.  At that time, Ybarra again argued that the district court

should have considered the Greenspan report.[6]  He insisted that the Nevada Supreme Court "adjudicated" his *Atkins* claim on the merits when it denied his motion for reconsideration in 2012, and that the Greenspan report was "before" the court at this time.  *See Pinholster*, 563 U.S. at 181–82 (quoting 28 U.S.C. § 2254(d)).

We concluded that this issue was reasonably debatable and "deserve[d] encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  We therefore granted a second COA as to whether the district court misapplied *Pinholster* and "improperly declined to consider the Greenspan report."

Now, over a year later, after receiving several rounds of supplemental briefs and after consolidating this appeal with two other matters, *see infra* Part III, we issue our decision.

I

But first, we must address a jurisdictional issue related to the unique posture of this case.  As discussed above, Ybarra sought review of his *Atkins* claim by filing a motion to reopen habeas proceedings.  Although the state did not pursue the argument on appeal,[7] we agree that this motion is

---

[6] Ybarra did not make this argument with regard to the other reports.

[7] Instead, the state argues that the district court violated either the law of the case or the rule of mandate when it considered Ybarra's *Atkins*-based motion.  These objections are without merit.  In our prior decision, we decided that the district court did not err when it ordered Ybarra to abandon his unexhausted claims, including his *Atkins* claim. *See Ybarra*, 656 F.3d at 997.  We did not reject that claim on the merits, nor did we suggest that the district court was barred from considering a proper Rule 60(b) motion.  These issues were therefore not "decided explicitly or by necessary implication," and the district court did not

not a second or successive habeas petition subject to 28 U.S.C. § 2244(b).

AEDPA generally limits a defendant to one round of federal habeas review and bars him from filing a second or successive petition without authorization from the appropriate court of appeals. 28 U.S.C. § 2244(b)(3)(A). If a defendant fails to obtain this authorization, a district court lacks jurisdiction to consider his petition. *Rishor v. Ferguson*, 822 F.3d 482, 490 (9th Cir. 2016). Moreover, a defendant cannot evade this requirement by simply calling his petition a Rule 60(b) motion. *United States v. Washington*, 653 F.3d 1057, 1060 (9th Cir. 2011).

To determine whether the district court had jurisdiction to consider Ybarra's motion, we must therefore determine whether it is actually a disguised habeas petition. There is no "bright-line rule for distinguishing between a bona fide Rule 60(b) motion and a disguised second or successive [petition]." *Id.* However, the Supreme Court has instructed us that a motion raising an entirely "new claim," or attacking "the federal court's resolution of a claim on the merits," is the latter. *Gonzalez v. Crosby*, 545 U.S. 524, 531–32 (2005).

We conclude that Ybarra's motion does neither of these things. Instead, as the district court has already observed, it is analogous to the motion at issue in *Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998).

The defendant in *Martinez-Villareal* originally filed a federal habeas petition that included a claim of incompetency under *Ford v. Wainwright*, 477 U.S. 399,

---

otherwise "vary" from our prior decree. *See United States v. Thrasher*, 483 F.3d 977, 981 (9th Cir. 2007) (citations omitted).

409–10 (1986) (holding that the Eighth Amendment prohibits the execution of the mentally incompetent). The district court dismissed this claim as premature, explaining that it was not ripe because an execution was not scheduled, and ultimately entered a judgment denying relief on the remaining claims. *Martinez-Villareal*, 523 U.S. at 640. When the defendant's execution warrant issued, he then filed a motion to set aside this judgment and reopen habeas proceedings so that he could pursue his *Ford* claim. *Id*.

The Supreme Court held that this motion was not a second or successive habeas petition under AEDPA. It observed that a *Ford* claim was included in the defendant's original petition, but dismissed for "technical procedural reasons." *Id.* at 645. It then concluded that such a "dismissal . . . [should not] bar the [defendant] from ever obtaining federal habeas review" of his claim. *Id.* at 644–45.

We agree that this case is sufficiently analogous. Like the *Ford*-based motion in *Martinez-Villareal*, Ybarra's *Atkins*-based motion does not raise an entirely new claim. Instead, it seeks to revive an existing claim. And like the *Ford* claim, this claim was originally dismissed for "technical procedural reasons." *Id.* at 645. Therefore, although Ybarra certainly "risk[ed] forfeiting" review of his *Atkins* claim when he abandoned it, *see Rose v. Lundy*, 455 U.S. 509, 520 (1982), his efforts to reinstate that claim do not fall within the purview of § 2244 so as to strip the district court of jurisdiction and categorically bar him "from ever obtaining federal habeas review," *Martinez-Villareal*, 523 U.S. at 645.

For these reasons, the district court did not err when it concluded that it had jurisdiction to consider Ybarra's *Atkins*-based Rule 60(b) motion. However, as explained below, it did err in its analysis concerning that motion.

II

This brings us to the primary issue on appeal. Under Rule 60(b), a defendant may seek relief "from a final judgment, order, or proceeding for . . . any . . . reason that justifies relief." Fed. R. Civ. P. 60(b)(6). To obtain relief under this catchall provision, a defendant must first make a threshold "showing of 'extraordinary circumstances.'" *Towery v. Ryan*, 673 F.3d 933, 940 (9th Cir. 2012) (per curiam) (quoting *Gonzalez*, 545 U.S. at 535).

The district court reasonably held that, to show extraordinary circumstances in this case, Ybarra must show that it would not be futile to reopen habeas proceedings. It then held that Ybarra could not satisfy this requirement because the existing and unfavorable intellectual disability determination is entitled to deference under AEDPA.

Reviewing de novo, *see Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005), we conclude that the district court erred in its analysis under AEDPA. First, it overlooked a number of instances where the Nevada Supreme Court contradicted the very clinical guidelines that it purported to apply, which is especially problematic in light of the recent decision in *Brumfield v. Cain*, 135 S. Ct. 2269 (2015). Second, it erred when it refused to consider the Greenspan report. We therefore vacate its order in Case No. 13-17326, and remand for reconsideration.

A

The Nevada legislature responded to *Atkins* by enacting Nevada Revised Statutes § 174.098(7) (2015), which provides that a person is intellectually disabled if he suffers from "[1] significant subaverage general intellectual functioning which [2] exists concurrently with deficits in

adaptive behavior and [3] manifested during the developmental period." When the Nevada Supreme Court issued its opinion in 2011, it explained that this "definition conforms to the clinical definitions espoused by . . . the American Association on Mental Retardation (AAMR) and the American Psychiatric Association (APA)." *Ybarra*, 247 P.3d at 273–74. It then purported to rely on clinical guidelines issued by these associations, explaining that they "provide useful guidance in applying the [statutory] definition." *Id.* at 274.

For example, it explained that, to show intellectual deficits under Prong 1, a defendant must typically present a valid IQ score between 70 and 75—which accounts for the standard error of measurement. *Id.* (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000) (DSM-IV)); *see also Hall v. Florida*, 134 S. Ct. 1986 (2014) (holding that a test imposing a strict IQ score cutoff at 70 was unconstitutional). It also explained that, to show adaptive deficits under Prong 2, a defendant must prove impairments "in at least two . . . skills areas." *Id.* at 274 n.6 (quoting DSM-IV, at 41). Finally, under Prong 3, it held that the developmental period is "the time before an individual reaches 18 years of age." *Id.* at 275–76 ("[T]he AAMR and the APA focus on the age of 18 years . . . ."). In this way, Nevada law incorporated clinical guidelines and diagnostic manuals well before the United States Supreme Court held that "[t]he medical community's current standards . . . constrain[] . . . States' leeway" to define intellectual disability. *Moore*, 137 S. Ct. at 1053.

At the evidentiary hearing before the Nevada state district court, two defense experts testified that Ybarra met

his burden of proof under all three prongs.**[8]**  But a third expert, testifying for the state, disagreed.  He opined that Ybarra was malingering during his IQ tests and failed to present any valid IQ scores.  This expert relied on the lack of evidence under Prong 1 to conclude that Ybarra failed to prove intellectual disability.  He did not offer further testimony regarding Prongs 2 and 3, explaining that, "to the extent that you don't have that first prong . . . these other prongs don't matter."

The Nevada state district court concluded that Ybarra failed to prove intellectual disability and denied his motion to strike the death penalty.  It largely credited the state expert and discredited the defense experts.  However, the court did not adopt the theory that, because Ybarra failed to present credible evidence under Prong 1, the other prongs "don't matter."  Instead, it held that Ybarra failed to make a showing under all three prongs—rejecting the unrebutted defense testimony under Prongs 2 and 3.  The Nevada Supreme Court agreed, adopting a similar analysis in its own opinion.  *See Ybarra*, 247 P.3d at 277–85.

The district court concluded that this determination is entitled to AEDPA deference.  Under AEDPA, a federal court must defer to a state court's adjudication of a claim unless it "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the

---

**[8]** Because we do not ourselves make a determination under AEDPA, we do not recount the state court proceedings at length.  *But see Ybarra*, 247 P.3d 269 (summarizing the relevant testimony and evidence).

evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

As an initial matter, we agree that the intellectual disability determination passes muster under § 2254(d)(1). *Atkins* held that the Eighth Amendment prohibits the execution of the intellectually disabled, but left "the task of developing appropriate ways to enforce [this] constitutional restriction" to the States. 536 U.S. at 317 (citation omitted). Significantly, *Atkins* "did not provide definitive procedural or substantive guides" to determine who qualifies as intellectually disabled. *Bobby v. Bies*, 556 U.S. 825, 831 (2009). And although Ybarra insists that the Nevada Supreme Court unreasonably applied *Atkins*, he relies almost exclusively on the Supreme Court's subsequent, more detailed decisions in *Moore*, *Hall*, and *Brumfield*. These decisions might redefine and expand *Atkins*,[9] but they cannot show that the Nevada Supreme Court applied *Atkins* in a way that "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

On the other hand, Ybarra plausibly argues that the Nevada Supreme Court made an unreasonable determination of fact under § 2254(d)(2). Under this subsection, we "may not second-guess a state court's fact-finding process unless, after review of the state-court record, [we] determine[] that

---

[9] This is especially true with regard to *Moore*, which changed the course of the Supreme Court's intellectual disability jurisprudence. *See* 137 S. Ct. at 1057–58 (Roberts, C.J., dissenting) ("Today's decision departs from this Court's precedents, followed in *Atkins* and *Hall*, establishing that the determination of what is cruel and unusual rests on a judicial judgment about societal standards of decency, not a medical assessment of clinical practice.").

the state court was not merely wrong, but actually unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). This standard is "difficult to meet," *Harrington*, 562 U.S. at 102, but it is not impossible. In fact, the Supreme Court recently offered helpful guidance as to how this standard might be met in the *Atkins* context.

"Kevan Brumfield was sentenced to death for the 1993 murder of [an] off-duty Baton Rouge police officer . . . ." *Brumfield*, 135 S. Ct. at 2273. He later sought relief from his sentence under *Atkins*, but the Louisiana state court refused to hold an evidentiary hearing because there was no "reasonable ground" to suspect that he was intellectually disabled. *Id.* at 2274. Brumfield then filed a federal habeas petition, arguing that the Louisiana state court's intellectual disability determination was unreasonable under AEDPA. The district court agreed, but the Fifth Circuit did not. The Supreme Court then granted certiorari. *Id.* at 2275–76.

Louisiana, like Nevada, relied on guidance from the APA and the AAMR to define intellectual disability. *Compare Brumfield*, 135 S. Ct. at 2274 (citing American Association of Mental Retardation, Mental Retardation: Definition, Classification, and Systems of Supports (10th ed. 2002) (AAMR-10); DSM-IV); *with Ybarra*, 247 P.3d at 273 (citing the same diagnostic manuals). But when the Louisiana state court refused to hold an evidentiary hearing, it made a number of statements that clearly contradicted those same guidelines. The Supreme Court relied on these contradictions to conclude that "the two underlying factual determinations on which the trial court's decision was premised—that Brumfield's IQ score was inconsistent with a diagnosis of intellectual disability and that he had presented no evidence of adaptive impairment," were

unreasonable under § 2254(d)(2). *Brumfield*, 135 S. Ct. at 2276–77.

For example, the Louisiana court erroneously stated that an IQ score of 75 was inconsistent with intellectual deficits, even though "[t]he sources on which [it] relied in defining subaverage intelligence both describe a score of 75 as being consistent with such a diagnosis." *Id.* at 2278 (citing AAMR-10, at 59; DSM-IV, at 41–42). It also disregarded evidence that Brumfield was antisocial on the ground that he had a personality disorder, which was improper because "an antisocial personality is not inconsistent with . . . adaptive impairment, or with intellectual disability more generally." *Id.* at 2280 (citing DSM-IV, at 47; AAMR-10, at 172).

The Nevada Supreme Court made a number of comparable errors in this case. For example, it ignored evidence that Ybarra was bullied in school on the ground that it was irrelevant under Prong 2. The trial court initially expressed concern over the notion that "the victim [of bullying] . . . has the problem," and the Nevada Supreme Court apparently agreed because it stated that evidence of bullying does "little to demonstrate adaptive behavior deficits." *Ybarra*, 247 P.3d at 284. But the AAMR specifically lists "gullibility" and an inability to "avoid[] victimization" as examples of limited social adaptive skills. AAMR-10, at 42. Similarly, under Prong 3, the Nevada Supreme Court suggested that any diagnostic test conducted after the age of 18 was "of little value." *Ybarra*, 247 P.3d at 283. But the AAMR specifically contemplates retrospective

assessment when there are no test scores available from the developmental period. *See* AAMR-10, at 93–94.**[10]**

It is true that the contradictory statements played a more central role in the underlying decision in *Brumfield*. The Louisiana state court refused to grant an evidentiary hearing because it concluded there was no "reasonable ground" to even suspect that Brumfield was intellectually disabled. 135 S. Ct. at 2274. This case might ordinarily be distinguishable. We acknowledge that the Nevada Supreme Court engaged in a lengthy and coherent analysis under Prongs 2 and 3; and only made a few, relatively minor, contradictory statements. In another case, we might find these statements insignificant. But in this case, where the only clinical experts to testify on Prongs 2 and 3 opined that the prongs were satisfied, we find these statements troubling. *See Van Tran v. Colson*, 764 F.3d 594, 610 (6th Cir. 2014) ("[T]he courts strain the limits of reasonableness by rejecting expert opinions based exclusively on the courts' own inexpert analysis.").

The state argues that, even if the Nevada Supreme Court was unreasonable with regard to its determination under Prongs 2 and 3, its decision was insulated by a reasonable determination under Prong 1. The state reminds us that a clinical expert concluded that Ybarra was malingering. This expert also specifically described Ybarra's "bizarre" performance on a number of tests, including a "complex figure test" where his score was worse than that of an

---

**[10]** We note that requiring individuals to provide formal test scores from their developmental period would likely "creat[e] an unacceptable risk that persons with intellectual disability will be executed" because not everyone who is intellectually disabled receives formal testing at a young age. *Cf. Hall*, 134 S. Ct. at 1990.

Alzheimer's patient or a person with a "debilitating" or "severely horrible disease[]."

We agree that the malingering determination was reasonable in light of this clinical expertise. But it is not clear that the malingering determination was the basis for the Nevada Supreme Court's determination under Prong 1. The court opined that "[t]he record as a whole . . . portrays Robert Ybarra as a person who does not have significant subaverage intellectual functioning." *Ybarra*, 247 P.3d at 282. Again, we are troubled by this statement. The relevant clinical guidelines specify that "[t]he assessment of intellectual functioning is a task that requires specialized professional training." AAMR-10, at 51. For this reason, although the malingering determination was reasonable because it was supported by expert testimony, the Prong 1 determination was unreasonable to the extent that it was based on the court's lay perception that Ybarra did not "look like" a disabled person. *See Moore*, 137 S. Ct. at 1051–52 ("Mild levels of intellectual disability, although they may fall outside [the] citizens' consensus, nevertheless remain intellectual disabilities.").

The state may be correct that the malingering determination constitutes an "independent basis" for the intellectual disability determination, thus rendering it reasonable under AEDPA. *Cf. Moore*, 137 S. Ct. at 1053 (Roberts, C.J., dissenting) (arguing that a proper determination under Prong 1 insulated an otherwise improper intellectual disability determination). Alternatively, Ybarra may be correct that lay stereotypes and nonclinical factors infect the state court's entire analysis, thus rendering it unreasonable. Rather than passing on these issues in the first instance, we leave the task to the district court. We conclude only that, in light of *Brumfield*, the

district court erred when it overlooked a number of contradictory statements made by the Nevada Supreme Court.

## B

We also conclude that the district court erred when it declined to consider the Greenspan report,[11] and we again remand so that the district court can consider its effect in the first instance.

### 1

According to *Pinholster*, federal "review under § 2254(d)[] is limited to the record that was before the state court that adjudicated the claim on the merits." 563 U.S. at 181. The district court concluded that *Pinholster* barred it from considering the Greenspan report because, although that report may have been before the Nevada Supreme Court in 2012, it was not before the court in 2011.

It is true that the Nevada Supreme Court first adjudicated Ybarra's *Atkins* claim on the merits when it issued its reasoned opinion in 2011. However, it also adjudicated the claim by denying Ybarra's motion for reconsideration in 2012. "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). Because the 2012 order is unexplained, we assume that it rests upon the same rationale as the 2011 opinion.

---

[11] Our review is de novo because the status of the Greenspan report under *Pinholster*, which interprets AEDPA, is a question of law. *See Gilley v. Morrow*, 246 F. App'x 519, 521 n.2 (9th Cir. 2007) (citing *Earp*, 431 F.3d at 1166).

Moreover, because the reasoned opinion rejects Ybarra's *Atkins* claim on the merits, we must assume that the unexplained order does the same. It therefore constitutes an adjudication on the merits under the law of this circuit. *Cf. Cannedy v. Adams*, 706 F.3d 1148, 1156 (9th Cir. 2013) (holding that an unexplained order denying a petition for review was an adjudication on the merits).

Additionally, the order clearly states that the Nevada Supreme Court "considered [the *Atkins*-based] motion" but found "no cause to reconsider" its 2011 opinion. For this reason, even without the *Ylst* presumption, it is clear that the court rejected Ybarra's *Atkins* claim on the merits in 2012.

2

This designation would ordinarily have little practical effect. When we attribute an earlier rationale to an unexplained order, we "look through" that order to the last reasoned opinion. *Ylst*, 501 U.S. at 806. In other words, we essentially change the date, and possibly the author, of the last reasoned opinion.

However, in rare instances, the record may have been "materially improved" between the issuance of the reasoned opinion and the unexplained order. *Cannedy*, 706 F.3d at 1156 n.3. In these instances, "confining our review to [the earlier] record would produce the anomalous result of upholding an erroneous decision . . . on a fuller record because an [earlier] decision was correct on a less-developed record." *Id*.

In *Cannedy*, for example, the California Court of Appeal first rejected a claim of ineffective assistance of counsel in a reasoned opinion. Cannedy then filed a petition for review—along with a duplicative original petition—in the

California Supreme Court. At this time, he also filed a supplemental declaration, in which he explained that his trial lawyer failed to contact a number of favorable witnesses. But the California Supreme Court declined review and denied the duplicative petition in an unexplained order. *Id.* at 1154–56.

Cannedy then filed a federal habeas petition. The district court granted relief, and we affirmed. When we conducted our review, we first assumed that the unexplained order qualified as an adjudication on the merits. *Cannedy*, 706 F.3d at 1156 (citing *Ylst*, 501 U.S. at 803). We then looked through that order, and read the opinion of the California Court of Appeal as if it were written by the California Supreme Court. We concluded that this opinion, although reasonable in light of the record before the California Court of Appeal, was unreasonable in light of the record before the California Supreme Court—which was "materially improved" by the supplemental declaration. *Id.* at 1156 n.3.

Ybarra argues that this case is the same as *Cannedy*. He observes that, like the supplemental declaration, the Greenspan report was attached to a motion seeking review and thus "before" the Nevada Supreme Court when it adjudicated his claim by issuing an unexplained order in 2012. He then asks us to treat the Greenspan report the same way as we treated the declaration in *Cannedy*—by asking whether the 2011 opinion was reasonable in light of the 2012 report.

We agree that *Cannedy* is analogous, but we also find it distinguishable. The Cannedy declaration was submitted, at least in part, "in accordance with state law." 706 F.3d at 1156 n.3. Cannedy filed two separate petitions with the California Supreme Court—a petition for review, and an

original habeas petition. The supplemental declaration was proper with regard to the original petition because, in that context, the California Supreme Court was not acting as a court of review. *See Carey v. Saffold*, 536 U.S. 214, 224–25 (2002) (noting that the original writ is interchangeable with a petition for review in California). In this case, however, the Greenspan report was attached to a motion seeking reconsideration of an opinion affirming a decision by the trial court. It was therefore, by all accounts, filed in violation of the relevant procedural rules. *See* Nev. R. App. Proc. 10 (describing the record on appeal as excerpts from the record below); Nev. R. App. Proc. 40(c) (specifying that rehearing is only warranted when the court "overlooked or misapprehended" a matter in the existing record).

But this only suggests that the Nevada Supreme Court was authorized to ignore the Greenspan report, it does not establish that it did so. And although this is not as clear a case as was before us in *Chambers v. McDaniel*, 549 F.3d 1191 (9th Cir. 2008), where the order specified that the court "considered *all the materials filed* by the parties," *id.* at 1198 (emphasis added), we hesitate to assume that the Nevada Supreme Court ignored the Greenspan report when it "considered" the motion to which it was attached. This is especially true where the motion included lengthy excerpts from that report.[12]

---

[12] For example, the motion includes the following excerpt:

> [F]or individuals in the sub-category of "mild" [intellectual disability] (IQ 55 to 75), one can do many things of a "normal" nature, such as work, drive a car, live independently, be married, etc. Obviously there are areas of deficit but these may not be clearly evident under typical circumstances. In situations that put a

We also find the differences between the two orders compelling. As discussed above, when the Nevada Supreme Court denied Ybarra's petition for rehearing, it expressly struck the Warnick report from the docket. However, when it denied his motion for reconsideration, it did not strike the Greenspan report. Additionally, although Justice Cherry joined the first order "in the result only," he joined the second order in full. Because the first order only accomplished two things—striking the Warnick report and denying the petition for rehearing—it is reasonable to conclude that Justice Cherry would have considered the Warnick report, and joined the second order in full because the court considered the Greenspan report.

Although these inferences may seem attenuated, the state offers no alternative explanation. Instead, it argues that the Nevada Supreme Court lacks discretion to expand the record on appeal in response to a motion for reconsideration. We are not convinced.

The state cites a number of decisions that appear to support its position, but most of these are dated and do not clearly hold that the court categorically lacks discretion to supplement the record on appeal. *See, e.g.*, *Vacation Village, Inc. v. Hitachi Am., Ltd.*, 901 P.2d 706, 707 (Nev. 1995) (declining "invitation to consider" evidence never presented to the district court and denying motion for leave to supplement the record); *Alderson v. Gilmore*, 13 Nev. 84, 84 (1878) (explaining that the court was unable to review

---

premium on good judgment, however, one's adaptive functioning deficits are most likely to become evident.

Motion for Stay Issuance of the Remittitur and to Reconsider Opinion at 14, *Ybarra*, 247 P.3d 269 (No. 52167).

findings and conclusions that the petitioner "neglected to include" in his statement of the case). And although there are cases that appear to provide more specific support for the state's position, *see, e.g.*, *Carson Ready Mix, Inc. v. First Nat. Bank of Nevada*, 635 P.2d 276, 277 (Nev. 1981), we are not ultimately persuaded that the Nevada Supreme Court is incapable of considering additional material. For one thing, the Nevada Rules of Appellate Procedure do not constrain the inherent authority of the Nevada Supreme Court, which is permitted to "suspend any provision of the[] rules" "for good cause." Nev. R. App. Proc. 2. Moreover, the Nevada Supreme Court may well have special authority to overlook technical defects in *Atkins* cases due to its legislative mandate to determine whether a prior intellectual disability determination "was correct." Nev. Rev. Stat. § 177.055(2)(b) (2015).[13]

It may be true that the Greenspan report was not filed in accordance with Nevada law. But the state has failed to convince us that the Nevada Supreme Court lacks the authority to overlook these defects, and it has failed to convince us that the differences between the two orders are trivial. We therefore conclude that the Greenspan report was part of the record under *Pinholster* because it was not expressly stricken, and that the district court erred when it refused to consider it. Once again, we express no view as to whether the Greenspan report changes the outcome under AEDPA. Instead, we simply vacate the order in Case No. 13-17326, and remand for reconsideration.

---

[13] We acknowledge that this appeal does not come to us following mandatory review under this provision, but we nevertheless find it persuasive.

## III

We now turn to the consolidated matters. In Case Nos. 17-15793 and 17-71465, Ybarra argues that he is entitled to relief from his death sentence in light of the Supreme Court's recent decision in *Hurst v. Florida*, 136 S. Ct. 616 (2016). We conclude that his arguments are without merit.

In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. This principle was extended to the capital sentencing context in *Ring v. Arizona*, 536 U.S. 584 (2002), when the Supreme Court held that Arizona's sentencing scheme was unconstitutional because it allowed a "sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty." *Id.* at 609. In *Hurst*, the Supreme Court once again applied this principle to invalidate Florida's capital sentencing scheme.

Florida's sentencing scheme was a hybrid one: A jury would offer a recommendation regarding the death penalty, but a judge would exercise his or her own "independent judgment about the existence of aggravating and mitigating factors" to determine whether the defendant was eligible for the death penalty. *Hurst*, 136 S. Ct. at 620 (citation omitted). Florida argued that this scheme was proper because the jury's recommendation was entitled to "great weight." *Id.* (citation omitted). The Supreme Court disagreed. It reiterated that "any fact on which the legislature conditions an increase in the maximum punishment . . . [is an] element," and held that Florida's scheme was unconstitutional because it allowed a judge to determine whether "sufficient aggravating circumstances exist [and

whether] . . . there are insufficient mitigating circumstances to outweigh [those] aggravating circumstances." *Id.* at 620–22 (citations and quotation marks omitted).

Under Nevada's capital sentencing scheme, "(1) the jury must unanimously find, beyond a reasonable doubt, at least one enumerated aggravating circumstance; and (2) each juror must then individually determine that mitigating circumstances, if any exist, do not outweigh the aggravating circumstances." *Servin v. State*, 32 P.3d 1277, 1285 (Nev. 2001). According to Ybarra, *Hurst* creates a new rule of constitutional law, and establishes that both of these findings are elements. Ybarra then argues that Nevada's scheme is unconstitutional because it does not require the "weighing determination" to be made beyond a reasonable doubt.

We are highly skeptical of this argument. In our view, the weighing determination is more akin to a sentence enhancement than to an element of the capital offense. As such, it is not clear that the Nevada sentencing scheme runs afoul of *Hurst*. And even more fundamentally, it is not clear that *Hurst* actually establishes a new rule of constitutional law at all. Instead, it may be nothing more than a direct application of *Ring*. *See Hurst*, 136 S. Ct. at 621–22 ("Like Arizona at the time of *Ring*, Florida does not require the jury to make the critical findings necessary to impose the death penalty.").

But for the sake of argument, we assume without deciding that *Hurst* creates a new rule; establishes that the "weighing determination" is an element; and renders the Nevada sentencing scheme unconstitutional. Nevertheless, even after making these generous assumptions, Ybarra cannot obtain relief under *Hurst*.

A

As with his *Atkins* claim, Ybarra first attempted to raise his *Hurst* claim by filing a Rule 60(b) motion. The district court denied this motion on the ground that it was a disguised and unauthorized second or successive habeas petition.

In Case No. 17-15793, we now "review the district court's decision to dismiss [Ybarra's] Rule 60(b) motion as an unauthorized second or successive . . . petition de novo." *Jones v. Ryan*, 733 F.3d 825, 833 (9th Cir. 2013). As explained above, there is no "bright-line rule for distinguishing between a bona fide Rule 60(b) motion and a disguised second or successive [petition]." *Washington*, 653 F.3d at 1060. But we agree that Ybarra's *Hurst*-based motion is clearly a disguised petition. Unlike his *Atkins*-based motion, it does not seek to reinstate a claim that was originally dismissed for "technical procedural reasons." *Martinez-Villareal*, 523 U.S. at 645. Instead, it seeks to set aside a sentence based on an entirely "new claim." *Gonzalez*, 545 U.S. at 531.

Ybarra argues that his motion is proper because it was filed to pursue a claim that was not "ripe" when he filed his original petition. *Cf. Panetti v. Quarterman*, 551 U.S. 930, 945–46 (2007) (holding that a petition raising a previously unripe claim of incompetency was not a second or successive petition under AEDPA). But this is not a question of ripeness. Ybarra seeks relief based on *Hurst*, which he claims establishes "a new rule of constitutional law . . . that was previously unavailable." 28 U.S.C. § 2244(b)(2)(A). AEDPA already establishes a procedure to address this type of claim; and that procedure requires Ybarra to obtain authorization to file a second or successive habeas petition. *Id.* Ybarra cannot evade this requirement by simply "disguis[ing]" his petition and calling it a Rule 60(b) motion. *See Washington*, 653 F.3d at 1060. We

therefore affirm the district court's order in Case No. 17-15793.

B

After he filed his improper motion, Ybarra also filed a proper application for leave to file a second or successive habeas petition.**[14]** In Case No. 17-71465, we now consider and deny that application on the ground that *Hurst* does not apply retroactively to cases on collateral review.

We may grant leave to file a proposed second or successive habeas petition "only if it presents a claim not previously raised that satisfies one of the two grounds articulated in § 2244(b)(2)." *Burton v. Stewart*, 549 U.S. 147, 153 (2007) (citations omitted). Ybarra argues that his petition satisfies the first ground because it relies on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." 28 U.S.C. § 2244(b)(2)(A). We note that this provision has two components: A new rule must apply retroactively, and the Supreme Court must *hold* that it applies retroactively. *See Tyler v. Cain*, 533 U.S. 656, 663

---

**[14]** Ybarra filed a fifth state habeas petition raising his *Hurst* claim one day before the end of the one-year statute of limitations established in 28 U.S.C. § 2244(d)(1)(C). Because that petition remains pending via an appeal, and because "[t]he time during which a properly filed application for State post-conviction or other collateral review . . . is pending" is tolled, his application is timely even though it was filed more than a year after *Hurst* was decided. *See Artuz v. Bennett*, 531 U.S. 4, 9 (2000) ("[W]hether an application has been 'properly filed' is quite separate from . . . whether the claims contained in the application are meritorious and free of procedural bar." (emphasis omitted)); *see also Carey*, 536 U.S. at 219–20 ("[A]n application is pending as long as the ordinary state collateral review process is in continuance—i.e., until the completion of that process." (citation and quotation marks omitted)).

(2001) ("[A] new rule is not 'made retroactive to cases on collateral review' unless the Supreme Court holds it to be retroactive" (quoting 28 U.S.C. § 2244(b)(2)(A))).

A new rule of constitutional law does not usually apply retroactively. *Teague v. Lane*, 489 U.S. 288, 310 (1989). There are, however, two exceptions. First, a rule applies retroactively if it is a substantive rule which "places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe." *Id.* at 311 (citation and quotation marks omitted). Second, a rule applies retroactively if it is a "watershed rule[] of criminal procedure." *Id.*

Ybarra first argues that *Hurst* establishes a substantive rule by "exclud[ing] a class of individuals from a death sentence who would otherwise be found death-eligible based on a standard of proof less rigorous than the beyond-a-reasonable-doubt-standard." In essence, he argues that the death penalty applies to a narrower range of conduct because the weighing determination now requires a higher level of proof.

Even if *Hurst* establishes that the weighing determination must be made beyond a reasonable doubt, this rule is nothing more than an extension of *Apprendi*. We have already held that *Apprendi* does not establish a substantive rule because it does not "decriminalize[] drug possession or drug conspiracies []or place[] such conduct beyond the scope of the state's authority to proscribe." *United States v. Sanchez-Cervantes*, 282 F.3d 664, 668 (9th Cir. 2002). The same logic applies here. Even if *Hurst* extends the reasonable-doubt standard to the weighing determination, it does not redefine capital murder or otherwise limit the conduct rendering a defendant eligible for the death penalty.

Ybarra next argues that *Hurst* establishes a watershed rule of criminal procedure because it reduces the risk of condemning a defendant who is actually ineligible for the death penalty due to countervailing mitigating circumstances. He asserts that, without the reasonable-doubt standard, accuracy in capital sentencing is "seriously diminished." *Schriro v. Summerlin*, 542 U.S. 348, 352 (2004) (quoting *Teague*, 489 U.S. at 313). In support, he cites several instances where the Supreme Court held that cases extending the reasonable-doubt standard applied retroactively. *See, e.g.*, *Ivan V. v. City of New York*, 407 U.S. 203, 204 (1972) (giving retroactive effect to *In re Winship*, 397 U.S. 358 (1970)); *Hankerson v. North Carolina*, 432 U.S. 233, 242 (1977) (giving retroactive effect to *Mullaney v. Wilbur*, 421 U.S. 684 (1975)).

The Supreme Court has already held that *Ring* is not a watershed rule with regard to its holding that a jury, as opposed to a judge, must make the findings that render a defendant eligible for the death penalty. It explained that judicial factfinding does not result in "an 'impermissibly large risk' of punishing conduct the law does not reach." *Schriro*, 542 U.S. at 355–56 (quoting *Teague*, 489 U.S. at 312). Similarly, we have already held that *Apprendi* is not a watershed rule with regard to its holding that "any fact . . . increas[ing] the penalty for a crime . . . must be . . . proved beyond a reasonable doubt." *Sanchez-Cervantes*, 282 F.3d at 666–67 (quoting *Apprendi*, 530 U.S. at 490). We concluded that this rule does "not rise to the level of importance of" other rules extending the reasonable-doubt standard because it "only affects the enhancement of a defendant's sentence once he or she has already been convicted beyond a reasonable doubt." *Id.* at 671.

If neither *Ring* nor *Apprendi* apply retroactively, we fail to see why *Hurst* would apply retroactively. Like these cases, the hypothetical rule established in *Hurst* involves only a sentencing determination. Under Nevada law, the prosecution must already prove both the elements of the capital offense and at least one aggravating sentencing factor beyond a reasonable doubt. *See Lisle v. State*, 351 P.3d 725, 731–32 (Nev. 2015). For this reason, *Hurst* does not "overcome an aspect of the criminal trial that *substantially* impairs its truth-finding function and so raises *serious* questions about the accuracy of *guilty verdicts*[.]" *Sanchez-Cervantes*, 282 F.3d at 671 (last emphasis added) (quoting *Hankerson*, 432 U.S. at 243).

We acknowledge that this case could be decided on the more narrow ground that, even if *Hurst* applied retroactively, the Supreme Court has never held that it applies retroactively as required with regard to a second or successive petition. *See Tyler*, 533 U.S. at 663. But because we have already held that *Apprendi* does not apply retroactively, and because the Supreme Court has already held that *Ring* does not apply retroactively, we also conclude that *Hurst* does not apply retroactively. We therefore deny Ybarra's application on the broader ground that *Hurst* does not apply retroactively at all—with regard to either initial or successive habeas petitions.

## Conclusion

In this appeal, we do not decide whether Ybarra is intellectually disabled, nor do we decide whether the Nevada Supreme Court made a reasonable or an unreasonable determination of fact when it concluded that he is not. Instead, we decide only that the district court erred in its analysis under AEDPA. We therefore vacate its order in

Case No. 13-17326, and remand for reconsideration in light of *Brumfield* and in light of the Greenspan report.

We agree that Ybarra's *Hurst*-based Rule 60(b) motion is a disguised and unauthorized second or successive habeas petition. We therefore affirm the district court's order denying that motion in Case No. 17-15793.

Finally, we hold that *Hurst* does not apply retroactively and consequently deny Ybarra's application for leave to file a second or successive habeas petition in Case No. 17-71465.

**VACATED and REMANDED in part; AFFIRMED in part; APPLICATION DENIED.**