**FOR PUBLICATION**

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

ROBERT YBARRA, Jr.,

*Petitioner-Appellant,*

v.

WILLIAM GITTERE, Warden,

*Respondent-Appellee.*

No. 20-99012

D.C. No.
3:00-cv-00233-
GMN-VPC

OPINION

Appeal from the United States District Court
for the District of Nevada
Gloria M. Navarro, District Judge, Presiding

Argued and Submitted March 22, 2023
Pasadena, California

Filed June 9, 2023

Before: Richard C. Tallman, Richard R. Clifton, and
Danielle J. Forrest, Circuit Judges.

Opinion by Judge Tallman

# SUMMARY[*]

## Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of Robert Ybarra Jr.'s federal petition for a writ of habeas corpus in a case in which Ybarra, who was sentenced to death for a 1979 murder, argued that he is intellectually disabled and therefore cannot constitutionally be executed under *Atkins v. Virginia*, 536 U.S. 304 (2002).

This court previously identified several errors in the Nevada Supreme Court's reasoning but remanded for the federal district court to determine whether the Nevada Supreme Court's overall intellectual disability determination was unreasonable.

On remand, the district court concluded that it was not and thus denied Ybarra's petition for relief.

In this appeal, the panel held that Ybarra's claim fails on the first prong ("Prong 1") of the three prongs required for relief on an *Atkins* claim—he failed to establish that he suffered from significantly subaverage intellectual functioning.

Ybarra argued that the Nevada Supreme Court unreasonably found that a 1981 IQ test was of "little value" because it was conducted well after Ybarra turned 18 and refused to consider any evidence outside the developmental period. The panel wrote that this argument is belied by a fair

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

reading of the Nevada Supreme Court's opinion, which gave three reasons for rejecting Ybarra's arguments. First, the Nevada Supreme Court explicitly rejected Ybarra's argument that the trial court had erred in crediting the 1981 IQ test over another expert's testing. The second reason was that, based on "Ybarra's school and other records, his writings, and evidence that he was malingering," the record as a whole (irrespective of the various IQ test scores) portrays Robert Ybarra as a person who does not have significant subaverage intellectual functioning." Finally, the Nevada Supreme Court said that it "need not decide the relevance, if any, of" the Flynn Effect, which causes average IQ test scores to inflate over time, "and the necessity of adjusting the 1981 IQ score" because that test occurred well after Ybarra turned 18. The panel wrote that even if the final reason was an unreasonable deviation from the clinical guidelines, the first reason was not. The panel wrote that the Nevada Supreme Court's second reason for rejecting Ybarra's criticism of the 1981 IQ test was also reasonable. The panel wrote that, taken in context, it is clear the Nevada courts did not base their Prong 1 determination on a "lay perception that Ybarra did not 'look like' a disabled person."

Ybarra's second argument was that reliance on anything other than expert testimony amounts to a reliance on "stereotypes" about intellectual disability. The panel wrote that this is incorrect: every expert, including Ybarra's experts, testified that, in forming their conclusions, they had interviewed Ybarra, reviewed records about Ybarra, or both. To the extent Ybarra's experts relied on faulty evidence (i.e., false statements by Ybarra during testing) or failed to consider evidence (i.e., records suggesting Ybarra was not intellectually disabled) it was not unreasonable to

find that their conclusions were invalid—especially since the trial court also considered Test of Memory Malingering ("TOMM") results. The panel wrote that even if the Nevada Supreme Court gave little weight to both the 1981 IQ test and the TOMM test, the Prong 1 finding is still not unreasonable.

Because the panel found that the Nevada Supreme Court's Prong 1 determination was reasonable, the panel did not consider the second and third *Atkins* prongs or the related procedural history.

---

## COUNSEL

Randolph Fiedler (argued), Hannah D. Nelson, and Joanne L. Diamond, Assistant Federal Public Defenders; Rene L. Valladares, Federal Public Defender of the District of Nevada; Federal Public Defenders' Office; Las Vegas, Nevada; for Petitioner-Appellant.

Jeffrey M. Conner (argued), Deputy Solicitor General; Heather D. Procter, Deputy Attorney General; Aaron D. Ford, Attorney General of Nevada; Office of the Nevada Attorney General; Carson City, Nevada; for Respondent-Appellee.

**OPINION**

TALLMAN, Circuit Judge:

The State of Nevada sentenced Robert Ybarra to die for brutally raping and murdering 16-year-old Nancy Griffith in 1979. Ybarra pled not guilty by reason of insanity but was convicted by the jury after a trial in the District Court for White Pine County in Ely, Nevada. Ybarra argues that he is intellectually disabled and therefore cannot constitutionally be executed under *Atkins v. Virginia*, 536 U.S. 304 (2002). The Nevada trial court held a hearing on Ybarra's *Atkins* claim and found he was not intellectually disabled, and the Nevada Supreme Court affirmed. Ybarra filed a petition for a writ of habeas corpus in federal district court which is subject to the restrictions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254. Ybarra argues that the Nevada Supreme Court's determination that he is not intellectually disabled is unreasonable under § 2254(d)(2).

We previously identified several errors in the Nevada Supreme Court's reasoning but remanded for the federal district court to determine whether the overall intellectual disability determination was unreasonable. *See Ybarra v. Filson* (*Ybarra IV*), 869 F.3d 1016, 1026 (9th Cir. 2017). On remand, the federal district court concluded that it was not and thus denied Ybarra's petition for relief. We agree and affirm. Because we ultimately conclude that Ybarra's *Atkins* claim fails on the first prong—that he failed to establish that he suffered from significantly subaverage intellectual functioning—we do not consider the second and third *Atkins* prongs or the related procedural history. *See Apelt v. Ryan*,

878 F.3d 800, 837 (9th Cir. 2017) (stating that a petitioner must meet all three *Atkins* prongs to prevail on his claim).

Pursuant to § 2253(c), the district court granted a certificate of appealability on the following issue: "Whether [the district] court erred in deferring, under 28 U.S.C. § 2254(d), to the state court's finding that petitioner is not intellectually disabled as contemplated by *Atkins v. Virginia*, 536 U.S. 304 (2002), and its progeny?"

## BACKGROUND

As recounted in prior opinions, this case has a complex and protracted history spanning 42 years. There have been several rounds of review in both state and federal courts.[1] While we have attempted to limit our discussion to factual and procedural matters relevant to Ybarra's *Atkins* claim, our summary remains lengthy.

### A

### 1

On September 29, 1979, two fishermen from Ely, Nevada, found sixteen-year-old Nancy Griffith lying on an unpaved road near that town. *Ybarra v. State* (*Ybarra I*), 679 P.2d 797, 798 (Nev. 1984). Nancy's body was badly burned, but she was still alive. *Id*. at 798-99. Nancy told a sheriff's deputy that she had been raped by a man in a red truck who worked north of where she was found. *Id*. She died the next day. *Id*.

---

[1] *See generally Ybarra v. State*, 679 P.2d 797, 798 (Nev. 1984); *Ybarra v. McDaniel*, 656 F.3d 984 (9th Cir. 2011); *Ybarra v. Baker*, No. 3:00-cv-0233, 2013 WL 5567586 (D. Nev. Oct. 8, 2013); *Ybarra v. Filson*, 869 F.3d 1016 (9th Cir. 2017).

The investigation into Nancy's murder revealed that on the evening of September 28, Nancy had met Robert Ybarra in Ely. *Id*. Ybarra worked on an oil rig near town and had driven Nancy and her friend around in his truck. *Id*. After her friend had left, Ybarra drove Nancy outside Ely where he raped and attempted to murder her. *See id*. Ybarra was arrested and charged with first degree murder, first degree kidnapping, battery with intent to commit sexual assault, and sexual assault. *Id*. at 798. At his state court trial, Ybarra's only defense was insanity. *Id*. at 799. It failed. Ybarra was convicted by a jury and sentenced to three consecutive life sentences and death. *Id*. at 799-800.

## 2

Ybarra was born in Sacramento, California, on July 20, 1953. His mother was either 15 or 16 when he was born, and he had three younger brothers and one younger sister. Ybarra's development was apparently fairly normal until age 9, when he was struck in the forehead by a railroad tie being used as a swing. After the head injury, Ybarra suffered migraines, and was prescribed various medications including Mebaral, a barbiturate which has sedative and anti-convulsant effects. Ybarra also suffered from auditory hallucinations and depression and started using drugs and alcohol.

By age 14, Ybarra was falling behind in school. Other students bullied him, including by calling him a "retard" on a daily basis. His doctor prescribed an amphetamine. Ybarra eventually transferred schools due to "peer problems and academic failure" before ultimately dropping out of high school entirely in 1969 at age 15. Ybarra instead attended night school, worked during the day, and received an adult education diploma just prior to age 19. Ybarra also enlisted

in the U.S. Marine Corps. Mental testing conducted by the military showed that Ybarra's intelligence was "dull normal" or "borderline," but he was found fit for duty. He was later discharged for homosexual conduct. Ybarra attempted to re-enlist in the Marine Corps but was recognized and kicked out. He also enlisted in the National Guard but was discharged again due to asthma.

Around 1974, Ybarra moved to Oregon where he met a woman who would later become his wife. They moved back to Sacramento where Ybarra's wife became pregnant; however, in 1979 she left him and returned to Oregon. Ybarra then worked in Montana before later moving to Ely in September of 1979. Ybarra worked throughout this period and was employed at the time of Nancy's murder. He was then 26 years old.

## B

On June 20, 2002, the United States Supreme Court decided *Atkins v. Virginia*, holding that the execution of intellectually disabled individuals violates the Eighth Amendment's prohibition on cruel and unusual punishment.[2] 536 U.S. at 321. However, *Atkins* recognized that there was still "serious disagreement" about who qualifies as intellectually disabled and "le[ft] to the State[s] the task of developing appropriate ways to enforce the constitutional restriction." *Id*. at 317 (second alteration in original) (quoting *Ford v. Wainwright*, 477 U.S. 399, 416-17 (1986)).

---

[2] When *Atkins* was decided, courts and medical groups used the term "mental retardation." Medical authorities have subsequently adopted the term "intellectually disabled." We adopt the modern terminology, except when directly quoting from older documents.

To comply with *Atkins*, the Nevada Legislature in 2003 adopted Nevada Revised Statute section 174.098.**[3]** *See Ybarra v. State* (*Ybarra II*), 247 P.3d 269, 273 (Nev. 2011). That statute provides that a defendant who is intellectually disabled may file a motion to strike the death penalty. Nev. Rev. Stat. § 174.098(1), (6). "The defendant has the burden of proving by a preponderance of the evidence that the defendant is intellectually disabled." § 174.098(5)(b). The statute establishes a three-pronged test for intellectual disability:

(1) "significant subaverage general intellectual functioning[;]"

(2) "which exists concurrently with deficits in adaptive behavior[;]" and

(3) which "manifested during the developmental period."

§ 174.098(7). This definition is similar to the clinical definition used by the American Association on Intellectual and Developmental Disabilities (AAIDD)**[4]** and the American Psychiatric Association (APA). *Ybarra II*, 247 P.3d at 274.

We first discuss the evidence presented at Ybarra's *Atkins* hearing, the state trial court's ruling, and the Nevada

---

[3] The Nevada legislature updated this statute in 2013 and in 2015 simply to remove the outdated language "mentally retarded" and replace it with "intellectually disabled." The statute remains identical in all other respects. *Compare* Nev. Rev. Stat. Ann. § 174.098 (2013), (2015) *with* Nev. Rev. Stat. Ann. § 174.098 (2003).

[4] Previously called the American Association on Mental Retardation (AAMR).

Supreme Court's opinion affirming that ruling. We then turn to our previous opinion, *Ybarra v. Filson (Ybarra IV)*, 869 F.3d 1016 (9th Cir. 2017), and the federal district court's ruling on remand.

1

After the adoption of section 174.098, Ybarra filed a motion to strike the death penalty. In April 2008, the Nevada state trial court held a two-day evidentiary hearing on Ybarra's motion. The trial court (Hon. Steve L. Dobrescu) considered new evidence from two experts who testified on behalf of Ybarra (Drs. David Schmidt and Mitchell Young) and one who testified on behalf of the state (Dr. Ted Young). The trial court also considered roughly 3,000 pages of written exhibits.

A

Dr. David Schmidt, a licensed clinical psychologist, was initially retained by Ybarra's counsel in 2000 to help develop mitigation evidence but, after *Atkins* was decided, he was asked to testify about whether Ybarra was intellectually disabled. Dr. Schmidt administered the Wechsler Adult Intelligence Scale III (WAIS III) test and other intelligence tests but conceded his testing was "problematic . . . at best" because of Ybarra's "problems with anxiety and . . . hallucinations and various things that were going on during the time of the testing." The WAIS III administered by Dr. Schmidt revealed Ybarra's IQ was 60. According to Dr. Schmidt, after accounting for measurement error in IQ scores, a score of 75 or below indicates the reduced level of intellectual functioning associated with intellectual disability. Dr. Schmidt opined that it would be difficult but not impossible for an individual to fake intellectual disability on an IQ test.

Dr. Schmidt also concluded that Ybarra suffered from deficits in adaptive behaviors because he had difficulty in school, had been bullied by classmates, lacked social skills, could not hold a job, had never had a job with more than minimum wage pay, was unable to remain in the military, and was not able to live on his own.  For example, Dr. Schmidt cited a 1969 letter from a doctor who opined that, at age 16, Ybarra should have received a medical exclusion from school because he had "gone about as far as he can go within [the] limits of his intellectual and emotional capabilities."  Dr. Schmidt concluded that Ybarra's adaptive deficits and significantly subaverage intellectual functioning had manifested in his "developmental years" and offered his professional opinion that Ybarra was "mentally retarded."

Dr. Schmidt also testified about an IQ test that Ybarra had been given in 1981 by Dr. Martin Gutride while Ybarra's competency was being evaluated prior to his trial. This test showed Ybarra's IQ was 86.  Dr. Schmidt testified that unlike the newer WAIS III test he administered to Ybarra, the WAIS test administered in 1981 was 26 years old at the time it was administered, and therefore had been affected by the "Flynn Effect."  Because IQ is a measure of relative rather than absolute intelligence, the Flynn Effect causes average IQ test scores to "inflate" over time, meaning that IQ tests must be periodically "re-normed" to ensure they are accurate.  Dr. Schmidt suggested that the failure to re-norm the test meant Ybarra's 1981 score could have been artificially inflated by as much as 15 points.  Dr. Schmidt also criticized the 1981 test because Dr. Gutride's intern had assisted with the testing.

In response to objections and cross-examination from the state, Dr. Schmidt agreed that an earlier version of his expert report included a "bold print" disclaimer stating that the

WAIS III test he had administered "may underestimate [Ybarra's] actual intellectual functioning" because of "the severe distress" testing caused Ybarra. This disclaimer was apparently removed from the final report. Later, Dr. Schmidt testified that he had "good confidence" in his testing but also seemed to equivocate: "[A]s I went back and reviewed post-*Adkins* [sic], this was a case to me that may or may not fit the standard, but certainly bears looking at further." Dr. Schmidt also admitted that if someone has taken multiple IQ tests, the higher score generally controls because it is not possible to fake a higher score. With respect to the 1981 IQ test, administered by Dr. Gutride, Dr. Schmidt conceded he could not "express an opinion about the validity of that test" with professional certainty.

The state further cross-examined Dr. Schmidt about the evidence he reviewed to reach his conclusions, including the military test, which showed Ybarra's intelligence was "dull normal"; Ybarra's marriage and the household he formed with his wife; and Dr. Schmidt's failure to interview Ybarra's prison guards or review prison records. The state also cross-examined Dr. Schmidt about Ybarra's school records, including a letter from Ybarra's seventh-grade teacher, which stated that he did not recall Ybarra "having any learning problems." Dr. Schmidt was generally unwilling to give any ground on cross-examination. For example, when asked about the teacher's letter, Dr. Schmidt suggested it was of little value because it was based on a 35-year-old recollection. When the state pointed out that Dr. Schmidt had relied on the 35-year-old recollections of Ybarra's family members, Dr. Schmidt responded that the teacher only saw Ybarra "for 50 minutes at a time in a class of 35 students."

B

Ybarra's second expert witness was Dr. Mitchell Young, a psychiatrist. As Dr. M. Young started to testify, the state asked "what is that note pad that you're reading from?" Dr. M. Young explained that he had not seen "the applicable legal standard relevant to matters before the court until yesterday morning" and "was not familiar" with the language of *Atkins*. Ybarra's counsel explained that Dr. M. Young was asked to "think in terms of what the Supreme Court noticed or held why those with mental retardation are barred from execution" and "address the concept of adaptive deficits in that context." Dr. M. Young then clarified that he was not intending to be a "substitute decision maker" for the court because "legal matters and diagnostic matters don't have . . . a one-to-one correspondence."

Dr. M. Young's report indicates that he administered a Survival Skills Quotient (SSQ) test to Ybarra and obtained a score of 79. The SSQ is a "test of adaptive behavior," and the raw score is "comparable to IQ." Ybarra's score was "in the borderline range of [intellectual disability]." Dr. M. Young also administered a test called the Rare Symptoms Scale, which is designed to detect malingering. Ybarra had a "markedly elevated" score on this test, and "tended to endorse items that untrained individuals are likely to identify as obvious signs of a major mental illness." The report nonetheless concludes that Ybarra "suffered and continues to suffer deficits in adaptive functioning" prior to age 18. At the hearing, Dr. M. Young testified that, to prepare his report, he had interviewed Ybarra and reviewed documents, including Dr. Schmidt's report, but that he could not reach a conclusion about whether Ybarra was intellectually disabled based solely on this evidence.

However, Dr. M. Young then said that he wanted to change his conclusion from that offered in his written expert report. Dr. M. Young had originally concluded that Ybarra was in the "mild to borderline mentally retarded range" based in part on the 1981 IQ score and Ybarra's adaptive deficits. However, based on what he had just learned from listening to Dr. Schmidt's testimony about the impact of the Flynn Effect and other issues with the 1981 test, he now believed that Ybarra qualified as intellectually disabled under the AAMR and APA standards. Dr. M. Young then opined that Ybarra suffered from adaptive behavioral deficits prior to age 18. Finally, Dr. M. Young testified that a 1991 medical report and Dr. Schmidt's testing indicated Ybarra had suffered from a brain injury during the developmental period.

On cross-examination, the state attacked the data on which Dr. M. Young had relied to form his conclusions. For example, Dr. M. Young agreed that his opinion would change again if Dr. Schmidt's test scores were erroneous. Dr. M. Young also testified about Ybarra's past statements which indicated that he was malingering, such as a statement Ybarra made in 1991 about how he never thought he would end up "having to act crazy" and a statement Ybarra made in 1981 about how he did not want to die by execution and would fight to stay alive. Dr. M. Young conceded that he had considered the possibility that Ybarra was faking his symptoms but insisted that malingering and intellectual disability "can co-exist and frequently do."

C

The state called Dr. Theodore Young, a licensed psychologist, to testify about his objective testing of Ybarra's cognitive ability. Dr. T. Young interviewed Ybarra

and then administered objective tests of Ybarra's cognitive ability, including an abbreviated WAIS III test. The initial results of the objective testing were "bizarre" and not "in any way typical of patients" that Dr. T. Young sees. This caused Dr. T. Young to suspect Ybarra was malingering. For example, Dr. T. Young administered the "Rey Complex Figure" test, which involves copying lines from a picture. Ybarra's performance on this test was so poor that it was impossible to score. Dr. T. Young noted that he had administered this test over 10,000 times, and that Ybarra's results were worse than those seen in Alzheimer's patients or among those with similarly debilitating diseases. Dr. T. Young also observed that Ybarra was apparently unable to spell two-, three-, and four-letter words, which was inconsistent with past samples of Ybarra's writing.[5]

Dr. T. Young went on to test Ybarra's intelligence using the abbreviated WAIS III. He found Ybarra's IQ was 66, which suggested "mild mental retardation." However, Dr. T. Young testified that the result was "not even close to being valid" because of Ybarra's malingering. Dr. T. Young testified that he also administered the "Test of Memory Malingering" (TOMM). The TOMM results suggested that Ybarra was malingering. Dr. T. Young testified that while some literature urges that a lower cut-off score should apply when the TOMM is used to test for malingering among a person who may be intellectually disabled, Ybarra's score was well below even the lower threshold advocated by some

---

[5] Ybarra argues the trial court's order misquotes Dr. T. Young's testimony about the results of the spelling test. However, the trial court noted that the official transcripts of the proceedings have significant errors and relied at least in part on the videotaped transcript of proceedings.

studies. Dr. T. Young was also asked about Dr. M. Young's report that Ybarra had "a markedly elevated score" on a test of rare psychiatric symptoms and agreed that this unusual result was similar to his own experience testing Ybarra.

Dr. T. Young strongly criticized Dr. Schmidt's testing of Ybarra, which he said did not meet APA standards because Dr. Schmidt failed to test for malingering. Dr T. Young specifically concluded that Dr. Schmidt's test was "invalid" because it was "absolutely clear . . . that the question of [Ybarra's] effort was not adequately addressed." Dr. T. Young also testified about the 1981 IQ test score of 86 obtained by Dr. Gutride and stated that this score put Ybarra "well above" the range for intellectual disability, which was "as high as 75." Dr. T. Young testified that while he had heard Dr. Schmidt's testimony that the 1981 test administered to Ybarra was obsolete, in fact the revised WAIS had not been released until after Ybarra's 1981 test, meaning Ybarra received the most current test then available. Finally, Dr. T. Young testified that Dr. Gutride's use of an intern to conduct the 1981 testing was not problematic because Dr. Gutride co-signed the report and remained fully professionally responsible for the finding.

On cross-examination, Dr. T. Young conceded that he had not evaluated the other two prongs required to establish intellectual disability—adaptive deficits and onset during the developmental period—because without a valid IQ test within the necessary range, "these other prongs don't matter." However, Dr. T. Young noted he had reviewed the same documentation about Ybarra that was available to Dr. M. Young and Dr. Schmidt and criticized their failure to objectively test Ybarra's adaptive functioning. Dr. T. Young also admitted that he had initially produced his report as an "interim" report, which addresses only his objective testing

of Ybarra's intellectual functioning because the background information about Ybarra had not yet been made available to him.

Dr. T. Young further agreed that he had not read the most current AAMR manual and had last reviewed the 1992 edition. He testified that he had read the portions of the current manual that were "reprinted in the *Atkins* decision" because he had reviewed that decision while preparing for his testimony. Ybarra's attorney also cross-examined Dr. T. Young about the studies supporting the use of the TOMM test to identify feigned intellectual disability. Ybarra's counsel and Dr. T. Young disagreed about the meaning of the treatise on which Dr. T. Young relied; the attorney pointed out that the treatise did not recommend use of the TOMM to identify feigned intellectual disability; Dr. T. Young contended that the treatise supported his conclusion that Ybarra's low score on the TOMM indicated malingering.

## 2

The Nevada district judge concluded that Ybarra failed to demonstrate by a preponderance of the evidence that he was intellectually disabled. The state court started by defining the relevant developmental period for the purposes of section 174.098. Based on his review of other states' laws, expert testimony, and the AAMR standards, Judge Dobrescu determined that the relevant developmental period was up to age 18.. However, Judge Dobrescu went on to consider evidence about Ybarra's intellectual functioning and adaptive behavioral deficits from outside that period because all the aforementioned testing occurred while Ybarra was in his mid-twenties or older.

With respect to Prong 1, Ybarra's intellectual functioning, Judge Dobrescu determined that Ybarra failed to show the onset of significant subaverage intellectual functioning during the developmental period. Judge Dobrescu noted that when Ybarra was tested by the Marine Corps, intelligence testing showed he was "dull normal" or "borderline," which is not intellectually disabled. The trial court credited the 1981 IQ test administered by Dr. Gutride, which had showed Ybarra's IQ was 86. The court also considered other medical records, interviews, and testing conducted by psychiatrists and psychologists after Ybarra's arrest, which suggested that his intelligence was below average but not intellectually disabled.

Judge Dobrescu rejected Dr. Schmidt's testimony about the impact of the Flynn Effect on the 1981 IQ test, finding that "numerous courts have rejected the notion of adjusting IQ scores to accommodate the Flynn Effect." However, the court noted that even after adjusting for the Flynn Effect, Ybarra's IQ would be 78—i.e., not intellectually disabled. Judge Dobrescu also rejected Dr. Schmidt's 2002 IQ test showing Ybarra's IQ was 60, noting the original "bold-faced disclaimer" in Dr. Schmidt's report which suggested Ybarra's IQ could have been underestimated and Dr. Schmidt's failure to employ any kind of test for malingering. The court noted that Dr. T. Young had specifically criticized Dr. Schmidt's failure to test for malingering and that Dr. Schmidt had been recalled to the stand but failed to respond to that criticism. Finally, the court rejected Dr. Schmidt's criticism of the 1981 IQ test as "pure speculation" and concluded that the 1981 score was supported by contemporaneous records from other evaluators who believed Ybarra was "dull normal or borderline" but not "mentally retarded."

Judge Dobrescu then concluded that Ybarra was likely malingering. While recognizing that malingering does not exclude the possibility that Ybarra had an intellectual disability, the court concluded that it must be considered in evaluating intellectual functioning. The court cited various medical records and opinions which supported Ybarra's history of malingering, including:

- A 1979 examination from a Doctor Lynn Gerow, who administered the Minnesota Multiphasic Personal Inventory (MMPI), and concluded Ybarra had "made an attempt to answer each question in a positive manner to indicate psychopathology."

- A 1981 letter from Doctor Donald Molde, who concluded that Ybarra's claims to suffer from hallucinations were "due to extra medical considerations" rather than mental illness.

- A 1981 letter from Doctor Richard Lewis, who, after reviewing three MMPI profiles administered to Ybarra, concluded that "the probability is very high" that Ybarra had "deliberately faked the tests in a pathological direction."

- Ybarra's 1981 statement to Doctor Gutride, while being evaluated for competency to stand trial, that he had "decided the best thing he could do was to pass the Sanity Commission so he could get on with his legal problems." Ybarra then passed three psychiatric examinations.

- A March 1981 letter from Ybarra, in which he indicated that he would be "nuts soon from not taking my meds," and asked the recipient to "pray for me to get a [not guilty by reason of insanity]" so that he

could return to a mental health facility rather than remain in jail. Judge Dobrescu observed that up to that point, Ybarra had generally maintained he was actually innocent of the murder.

- A 1985 progress note signed by a "Dr. Knapp," which indicated that Ybarra was "mentally ill" but "tries to fake psychosis."

- A 1991 progress note recording Ybarra's statement, made while in the prison mental health unit, that he never thought he would end up in here "having to act crazy."

Judge Dobrescu also observed that Ybarra had requested copies of his own medical records on several occasions, repeatedly refused medication, and had written hundreds of prison "kites" (which are "form[s] used by prison inmates to communicate with staff . . . .") and other correspondence which showed a level of intelligence inconsistent with intellectual disability. *Richey v. Dahne*, 807 F.3d 1202, 1205 n.3 (9th Cir. 2015). Some of Ybarra's statements indicated a level of sophistication about legal defenses. For example, Ybarra questioned a doctor about multiple personality disorder and mentioned that that he knew of a person who had his case dismissed because he had that disorder. Judge Dobrescu concluded that Dr. Gutride's 1981 IQ test was most likely to be valid because Ybarra had, at that point, decided to put forward his best effort on the test so he could move on with his case.

Finally, in discussing the expert testimony, the court observed that Dr. Schmidt had testified that a person cannot fake being smarter than they actually are on an IQ test. The court also noted the results of Dr. T. Young's spelling test and concluded that Ybarra's apparent inability to spell

simple words was not consistent with letters and kites he had written.  Finally, the court discussed Dr. T. Young's TOMM test and his conclusion that there was "no valid IQ test result . . . below 70 in the record."  Judge Dobrescu concluded that the preponderance of evidence showed Ybarra "is not significant [sic] subaverage intellectual functioning."

3

Ybarra appealed to the Nevada Supreme Court, arguing the trial court erred by holding that he had failed to show he was intellectually disabled under section 174.098(7). *Ybarra II*, 247 P.3d at 270.  The Nevada Supreme Court first construed the definition of "mentally retarded" in the statute. *Id*. at 273-74.  After examining the history of the statute, the appellate court concluded that "[g]iven the similarities between the statutory definition and the clinical definitions of mental retardation, the AAMR and APA provide useful guidance in applying the definition."  *Id*. at 274.  Looking to Prong 1—intellectual functioning—the state supreme court concluded that "the clinical definitions indicate that 'individuals with IQs between 70 and 75' fall into the category of subaverage intellectual functioning."  *Id*. (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 41 (4th ed. 2000)).

The appellate court then considered Ybarra's challenges to Judge Dobrescu's decision, concluding it would "defer[] to the  court's factual findings so long as those findings are supported by substantial evidence and are not clearly erroneous, but . . .  review the legal consequences of those factual findings de novo."  *Id*. at 276.  The appellate court described the record evidence, hearing testimony, and the trial court's decision at some length.  *Id*. at 277-81.  The court then turned to Ybarra's two main arguments.  Ybarra

argued that the trial court wrongly determined that he did not have subaverage intellectual functioning under Prong 1 because it (1) "erroneously focused on the 1981 IQ test to the exclusion of the IQ results Dr. Schmidt obtained" and (2) "erroneously relied on the tests administered by the State's expert because he used improper testing instruments, scoring, and administration techniques." *Id*. at 281.

First, the Nevada Supreme Court found that the trial court had not improperly focused on the 1981 IQ test. *Id.* at 281-83. Ybarra argued the trial court should not have relied on the 1981 IQ score because, if it had been adjusted to account for the Flynn Effect as suggested by Dr. Schmidt, the adjusted score would suggest Ybarra was mildly intellectually disabled. *Id*. at 281. The state high court held that this argument failed for three separate reasons: First, Judge Dobrescu had found Dr. Schmidt's testimony about the Flynn Effect "incredible" in light of sources that rejected its application and other record evidence which supported the "validity" of the 1981 IQ score. *Id*. at 282. Nevertheless, the trial court had accounted for the Flynn Effect and, after applying an adjustment, concluded Ybarra's IQ was 78—outside the range required for intellectual disability. *Id*. The supreme court held this adjustment was "not without foundation." *Id*.

The state high court gave two other reasons for rejecting Ybarra's argument. It noted that the trial court had also considered other evidence in the record, such as Ybarra's "school and other records, his writings, and evidence that he was malingering" and therefore "did not rely solely on the 1981 IQ test." *Id*. Finally, the court observed that it did not need to decide the relevance of the Flynn Effect "because the 1981 IQ test, as with all of Ybarra's IQ tests, was administered well after he turned 18 years of age. Therefore,

this issue has little value in evaluating whether Ybarra presented sufficient evidence to establish mental retardation." *Id*. at 282-83.

The Nevada Supreme Court then turned to Ybarra's argument that the trial court had improperly relied on the IQ test and TOMM test administered by Dr. T. Young. *Id*. at 283. The court held that the trial court's consideration of Ybarra's TOMM score did not require reversal. *Id.* The Nevada Supreme Court reasoned that while the trial court "clearly" considered the TOMM results, it also considered a "wealth of other evidence in determining that Ybarra was malingering," such as his prison kites, medical progress notes, and emphasized that "comments by mental health professionals who evaluated Ybarra during his incarceration indicated that their testing of Ybarra revealed malingering." *Id.* The state supreme court then added that "as with the 1981 IQ score, the TOMM score is of little value in determining whether Ybarra met his burden of proving significant subaverage intellectual functioning, as the TOMM was administered well after Ybarra reached 18 years of age." *Id*. at 283. The Nevada Supreme Court found that Ybarra had failed to show subaverage intellectual functioning which manifested during the developmental period. *Id*. at 283-84.

4

After the Nevada Supreme Court issued its decision, Ybarra filed a motion to reconsider. This motion included as a newly offered exhibit a report dated March 28, 2012, by Dr. Stephen Greenspan, a psychologist and expert on intellectual disability. Dr. Greenspan interviewed Ybarra, spoke to Ybarra's family members, and reviewed a number of other materials. Dr. Greenspan's report concluded that

Ybarra "meets all three prongs of the definition of mental retardation" under both the statutory and clinical definitions.

Dr. Greenspan's report first argued that Ybarra has significantly subaverage intellectual functioning based on the results of the IQ tests administered by Drs. Schmidt and T. Young. Dr. Greenspan opined that the 1981 IQ test conducted by Dr. Gutride used outdated norms and that after adjusting for the Flynn Effect, Ybarra's score on the 1981 IQ test would be 78—close to, but not below, "the clinically-recommended ceiling of 75." Dr. Greenspan also quoted one of Dr. Schmidt's colleagues, who (like Dr. Schmidt) criticized Dr. Gutride for having an intern administer the test to Ybarra.[6] Finally, Dr. Greenspan suggested that Dr. T. Young erred in using the TOMM to evaluate Ybarra for malingering and contended the TOMM has never been validated on low-IQ individuals.

The Nevada Supreme Court unanimously denied Ybarra's motion to reconsider but did not provide any reasons for doing so and did not strike Dr. Greenspan's late-filed report from the record. *Ybarra IV*, 869 F.3d at 1020-21.

5

In 2012, Ybarra again sought habeas relief from the federal district court. *Ybarra v. Baker*, No. 3:00-cv-0233, 2013 WL 5567586, at *1 (D. Nev. Oct. 8, 2013). He filed a motion for relief from judgment under Fed. R. Civ. P. 60(b)(6), asking the federal district court to set aside its prior

---

[6] The Greenspan Report referenced reports by Drs. Mack and Warnick. Those doctors filed reports which were stricken by the Nevada Supreme Court and are not part of the state court record. *See Ybarra IV*, 869 F.3d at 1020, 1029.

judgment denying him habeas relief and consider the merits of his *Atkins* claim. *Id.* The district court denied the motion on the merits, finding that the Nevada Supreme Court's determination that Ybarra was not intellectually disabled was not unreasonable under AEDPA. *Id*. at *8.

6

Ybarra appealed, and we vacated the district court's order. *Ybarra IV*, 869 F.3d at 1019. While we "express[ed] no view as to whether the Nevada Supreme Court's intellectual disability determination was reasonable" under AEDPA, we found that the district court had erred when it "overlooked a number of instances where the Nevada Supreme Court contradicted the very clinical guidelines that it purported to apply." *Id*. at 1019, 1023. We held that Nevada Revised Statute section 174.098 had "incorporated clinical guidelines and diagnostic manuals" in defining intellectual disability well before the Supreme Court had concluded that doing so was a constitutional requirement. *Id*. at 1024. We then identified several errors in the Nevada Supreme Court's reasoning:

> For example, it ignored evidence that Ybarra was bullied in school on the ground that it was irrelevant under Prong 2. The trial court initially expressed concern over the notion that "the victim [of bullying] . . . has the problem," and the Nevada Supreme Court apparently agreed because it stated that evidence of bullying does "little to demonstrate adaptive behavior deficits." But the AAMR specifically lists "gullibility" and an inability to "avoid[] victimization" as examples of limited social adaptive skills.

> Similarly, under Prong 3, the Nevada
> Supreme Court suggested that any diagnostic
> test conducted after the age of 18 was "of
> little value." But the AAMR specifically
> contemplates retrospective assessment when
> there are no test scores available from the
> developmental period.

*Id*. at 1026 (citations omitted).

In response to the state's argument that Ybarra's failure to prove Prong 1 was dispositive, we agreed that the Nevada Supreme Court's malingering determination was reasonable in light of Dr. T. Young's testimony but remanded for the district court to examine whether that finding "was the basis for the Nevada Supreme Court's determination under Prong 1." *Id*. We observed that "the Prong 1 determination was unreasonable to the extent that it was based on the court's lay perception that Ybarra did not 'look like' a disabled person." *Id*. at 1026-27. We explained that the "state may be correct that the malingering determination constitutes an 'independent basis' for the intellectual disability determination, thus rendering it reasonable under AEDPA. Alternatively, Ybarra may be correct that lay stereotypes and nonclinical factors infect the state court's entire analysis, thus rendering it unreasonable." *Id.* (citation omitted). But "[r]ather than passing on these issues in the first instance, we [left] the task to the district court" to evaluate. *Id.* Finally, we also concluded that the district court erred by refusing to consider the Greenspan Report as part of the state court record and directed it to consider the Report on remand. *Id*. at 1027.

7

On remand, the district court again took up the question of Ybarra's intellectual disability and found the Nevada Supreme Court had not unreasonably determined Ybarra failed to prove the first prong. The district court concluded that the Nevada Supreme Court had not ruled as it did because Ybarra did not "look like a disabled person." Rather, the state courts found that the only sub-75 IQ scores in the record were invalid because of Dr. Schmidt's disclaimer as to the accuracy of his results and Dr. T. Young's testimony about the likelihood that Ybarra was malingering. The state courts also credited Dr. Gutride's 1981 IQ score and rejected Dr. Schmidt's criticism of that test because (1) the AAMR manual did not recommend adjusting for the Flynn Effect, (2) an adjustment would still leave Ybarra with an IQ of 78, and (3) Dr. Schmidt admitted he "really could not talk about" the 1981 score's validity. Finally, the district court noted concerns with Dr. Greenspan's report that called into doubt his analysis of this prong, including the fact that Dr. Greenspan filed two versions of his report because the first one contained errors.

## DISCUSSION

We are now asked to review the federal district court's analysis of the questions we remanded for it to consider, namely, whether lay stereotypes and nonclinical factors infected the state court's entire analysis and how the Greenspan Report should factor into that analysis. We review de novo the federal district court's review of the state court's decision. *Ybarra IV*, 869 F.3d at 1023. However, under AEDPA, we may not grant Ybarra habeas relief unless the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented

in the State court proceeding." § 2254(d)(2). A state court's factual determination of his intellectual functioning is not unreasonable simply because we would have reached a different conclusion. *Dixon v. Shinn*, 33 F.4th 1050, 1054 (9th Cir. 2022). "A petitioner challenging the substance of the state court's findings must show 'that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.'" *Prescott v. Santoro*, 53 F.4th 470, 479 (9th Cir. 2022) (quoting *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012)). This "daunting standard" is "satisfied in relatively few cases" but "is not impossible to meet." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004), *overruled on other grounds by Cullen v. Pinholster*, 563 U.S. 170, 185 (2011).

If the state court's determination of the facts was unreasonable, we must then review Ybarra's *Atkins* claim de novo before we may grant habeas relief. *See Maxwell v. Roe*, 628 F.3d 486, 494-95 (9th Cir. 2010). Even if Ybarra's claim has merit, the United States Supreme Court has recently suggested that a state prisoner is "never entitled to habeas relief" unless he persuades the court that both "law and justice require [it]." *Shinn v. Ramirez*, 142 S. Ct. 1718, 1731 (2022) (alteration in original) (quoting *Brown v. Davenport*, 142 S. Ct. 1510, 1524 (2022)).

I

To prevail on his petition for habeas relief, Ybarra must show that the Nevada Supreme Court unreasonably determined that he failed to prove that (1) he had significantly subaverage intellectual functioning; (2) he suffered from adaptive behavioral deficits; and (3) those symptoms manifested prior to age 18. Ybarra fails to make

a showing that he had significantly subaverage intellectual functioning.  That is dispositive and defeats the basis of his habeas claim.

Ybarra's first argument that the determination is unreasonable rests on a narrow reading of the Nevada Supreme Court's decision.  Ybarra argues that the court unreasonably found that the 1981 IQ test administered by Dr. Gutride was of "little value" because it was conducted well after Ybarra turned 18 and refused to consider any evidence from outside the developmental period.  Ybarra contends that because we have already held that it would be an error to disregard any testing conducted outside the developmental period, the Nevada Supreme Court's determination of Prong 1 is unreasonable.  *Ybarra IV*, 869 F.3d at 1026.  Ybarra claims that while the state trial court may have relied on the 1981 IQ test, the Nevada Supreme Court declined to adopt that logic, and so could not have relied on the 1981 test to find that Ybarra had failed to prove Prong 1.  Accordingly, Ybarra argues that the federal district court erred in concluding that the Nevada Supreme Court had "affirm[ed] the lower court's reliance on the 1981 IQ test that yielded a score of 86."

This argument is belied by a fair reading of the Nevada Supreme Court's opinion.  The sentences in the opinion that Ybarra repeatedly cites are in fact only part of that court's response to Ybarra's contention that the trial court erred by (1) "disregarding" Dr. Schmidt's IQ testing; (2) concluding that the 1981 test "was valid"; and (3) failing to account for the Flynn Effect.  *Ybarra II*, 247 P.3d at 281.  In fact, the Nevada Supreme Court gave "three reasons" for rejecting Ybarra's arguments.  *Id*. at 282.  First, the court explicitly rejected Ybarra's argument that the trial court had erred in crediting the 1981 IQ test over Dr. Schmidt's testing:

> [T]he district court did not disregard Dr.
> Schmidt's testimony regarding the Flynn
> effect. Rather, the court *found the testimony
> incredible* considering (a) other sources that
> either rejected the theory or did not demand
> adjustments in IQ scores to account for it; and
> (b) *other evidence in the record supporting
> the validity of the 1981 IQ score*, including
> evaluations from mental health professionals
> and Ybarra's military records reporting that
> he was of dull-normal to borderline
> intelligence. And although the district court
> was "not convinced [that] the scientific
> community is prepared to adjust the scores
> according to the Flynn effect," it nevertheless
> considered the Flynn effect and concluded
> that an adjustment for that effect reduced the
> 1981 IQ score to 78, which is outside the
> range of mental retardation . . . . [That]
> calculation *was not without foundation*.

*Id.* (emphasis added).

Only then did the Nevada Supreme Court proceed to give
two other, independent reasons for rejecting Ybarra's
arguments. The second reason it gave for affirming the trial
court's finding was that, based on "Ybarra's school and other
records, his writings, and evidence that he was malingering"
the "record as a whole (irrespective of the various IQ test
scores) portrays Robert Ybarra as a person who does not
have significant subaverage intellectual functioning." *Id*.
Finally, the Nevada Supreme Court said that it "need not
decide the relevance, if any, of the Flynn effect and the

necessity of adjusting the 1981 IQ score" because the 1981 IQ test occurred well after Ybarra turned 18.  *Id*. at 282-83.

Even if this final reason was an unreasonable deviation from the clinical guidelines, *see Ybarra IV*, 869 F.3d at 1026, the first reason was not.  The Nevada Supreme Court found that the trial court had not erred in finding Dr. Schmidt's criticism of the 1981 IQ test "incredible" and found the "validity" of that test was supported by the record.  *Ybarra II*, 247 P.3d at 282.  And it affirmed the trial court's finding that, even accounting for the Flynn Effect, Ybarra's 1981 IQ score was still not below 75—which Ybarra concedes is required to show significantly subaverage intellectual functioning.  *Id*.  This was not unreasonable.  Dr. Schmidt admitted his own tests might underestimate Ybarra's "actual intellectual functioning."  Dr. T. Young defended the validity of the 1981 IQ score in his testimony and criticized Dr. Schmidt's testing.  The state court was free to "credit one expert over another."  *Apelt*, 878 F.3d at 837.

The Nevada Supreme Court's second reason for rejecting Ybarra's criticism of the 1981 IQ test was also reasonable.  As the court explained:

> [T]he district court did not rely solely on the 1981 IQ test to determine that Ybarra had not proven that he suffers from significant subaverage intellectual functioning.  As explained above, the district court also looked to Ybarra's school and other records, his writings, and evidence that he was malingering.  In fact, the district court expressly observed in its order that "[t]he record as a whole (irrespective of the various IQ test scores) portrays Robert Ybarra as a

person who does not have significant subaverage intellectual functioning now or during his developmental years."

*Ybarra II*, 247 P.3d at 282. We were "troubled by this statement" out of concern that it may have been "based on the court's lay perception that Ybarra did not 'look like' a disabled person." *Ybarra IV*, 869 F.3d at 1026-27. However, we also suggested that to the extent that this finding was informed by a determination that Ybarra was malingering, it was reasonable. *Id*. at 1026.

As the federal district court noted on remand, the quotation about the "record as a whole" is taken from a section in the trial court decision titled "Malingering and Other Evidence of Intellectual Functioning." That section of the state trial court's decision notes that, when asked if he saw evidence of malingering in records he reviewed to prepare for his testimony, Dr. Schmidt mentioned only Dr. T. Young's report and "some issues" from the state correctional medical center where Ybarra was evaluated for competency. The state trial court then criticizes Dr. Schmidt for ignoring numerous other pieces of evidence which suggest malingering, including Ybarra's 1979 and 1981 attempts to manipulate the MMPI, his 1991 statement about "having to act crazy" in prison, and the conclusions of other doctors that Ybarra was faking psychological symptoms. It also discusses in passing Ybarra's ability to "manipulate health care professionals, attorneys, play scrabble, backgammon, racquetball and volleyball, and his ability to type, read medical literature, [and] write coherent meaningful letters." Finally, the trial court closed this section by noting that Dr. T. Young's testing, including the TOMM test, suggested that Ybarra was malingering.

Taken in context, it is clear the Nevada courts did not base their Prong 1 determination on a "lay perception that Ybarra did not 'look like' a disabled person." *Ybarra IV*, 869 F.3d at 1027. Parts of the trial court's decision arguably make this error, such as by discussing Ybarra's ability to play games and write letters. *Ybarra II*, 247 P.3d at 280; *see also Moore v. Texas* (*Moore II*), 139 S. Ct. 666, 671 (2019) (criticizing the appellate court for considering adaptive strengths developed in prison). But most of the section of the state trial court's decision in question (1) finds that Dr. Schmidt's testimony and IQ testing is not credible because he failed to adequately consider evidence that Ybarra was malingering and (2) cites Dr. T. Young's testimony to conclude Ybarra was malingering. This was not unreasonable; a finder of fact may consider the data an expert relied on in reaching an opinion, *see* FED. R. EVID. 705, and "reject" expert testimony based on "the reasons given for the opinion" and "the other evidence in the case." *See* NINTH CIR. MODEL CRIM. JURY INSTR. § 3.14 (2023); *see also Ochoa v. Davis*, 50 F.4th 865, 903-04 (9th Cir. 2022) (citing petitioner's school records, social activities, and criminal conduct in concluding he had failed to show significant adaptive deficits). Courts are not required to credit expert testimony. *See Ochoa*, 50 F.4th at 905; *Apelt*, 878 F.3d at 837-38; *Cain v. Chappell*, 870 F.3d 1003, 1023-24 (9th Cir. 2017).

Ybarra's second argument is that reliance on anything other than expert testimony amounts to a reliance on "stereotypes" about intellectual disability. For example, Ybarra asserts repeatedly that the Nevada Supreme Court erred in relying on a "wealth of other evidence" in concluding that Ybarra was malingering, because "none of the experts relied" on it in reaching a conclusion about

intellectual functioning.  But this is simply incorrect: every expert, including Ybarra's experts, testified that, in forming their conclusions, they had interviewed Ybarra, reviewed records about Ybarra, or both.  To the extent Ybarra's experts relied on faulty evidence (i.e., false statements by Ybarra during testing) or failed to consider evidence (i.e., records suggesting Ybarra was not intellectually disabled) it was not unreasonable to find that their conclusions were invalid—especially since the trial court also "considered the TOMM results."  *Ybarra II*, 247 P.3d at 283.  A court's intellectual disability determination must be informed by clinical guidance, but "'the views of medical experts' do not 'dictate'" the outcome. *Moore v. Texas (Moore I)*, 581 U.S. 1, 13 (2017) (quotation omitted).

Finally, even if Ybarra is correct that the Nevada Supreme Court gave little weight to both (1) the 1981 IQ test and (2) the TOMM test, the Prong 1 finding is still not unreasonable.  As discussed, it was Ybarra's burden to prove Prong 1 by a preponderance of the evidence, which requires an IQ score of 75 or below.  *See* Nev. Rev. Stat. § 174.098(5)(b).  There are only two such scores in the record: Dr. T. Young's, which he disclaimed as invalid, and Dr. Schmidt's score.  The Nevada Supreme Court affirmed the trial court's finding that Dr. Schmidt's testimony was not credible, *see Ybarra II*, 247 P.3d at 279, 282, 284, and that finding is likely entitled to double deference, *see id*. at 276 ("Matters of credibility . . .  remain . . . within the [trial] court's discretion."); and was not unreasonable for the reasons already discussed.  Thus, even if the Nevada Supreme Court gave little weight to the 1981 IQ score, the absence of any valid sub-75 IQ would still mean Ybarra failed to meet his burden.

Dr. Greenspan's report adds little in terms of intellectual functioning. Dr. Greenspan recalculated the impact of the Flynn Effect on the 1981 IQ test, and concluded that even accounting for that effect, Ybarra's IQ was 78—essentially confirming that the trial court's calculation was correct. Dr. Greenspan's report otherwise rehashes criticisms that were already made by Dr. Schmidt: he repeats Dr. Schmidt's critiques of the 1981 IQ score and criticizes Dr. T. Young's use of the TOMM test for the same reasons that Dr. Schmidt did. Finally, Dr. Greenspan's report says virtually nothing about the other evidence that Ybarra was malingering. As a result, Ybarra's Prong 1 argument still fails because no valid IQ test has shown significantly subaverage intellectual functioning. Because we find that the Nevada Supreme Court's Prong 1 determination was reasonable, we do not consider Prongs 2 or 3 and Ybarra's petition must be denied. *See Apelt*, 878 F.3d at 837 ("To prevail on his *Atkins* claim, [the petitioner] must meet all three prongs of the test for intellectual disability.").

## CONCLUSION

Because the Nevada Supreme Court was not unreasonable in finding that Ybarra had failed to prove he is intellectually disabled by a preponderance of the evidence, the district court's denial of his federal petition for a writ of habeas corpus was correct.

**AFFIRMED.**